CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUN 14 2016

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| LISA ANN MCKINLEY, | ) | |
| | ) | Civil Action No. 7:15CV00166 |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OPINION** |
| v. | ) | |
| | ) | Hon. Glen E. Conrad |
| THE SALVATION ARMY, | ) | Chief United States District Judge |
| | ) | |
| Defendant. | ) | |

Lisa Ann McKinley filed this action under Title VII of the Civil Rights Act of 1964 ("Title VII") against her former employer, The Salvation Army. McKinley alleges that she was sexually harassed by Michael Moffitt, an individual she refers to as her supervisor, and that she was constructively discharged by The Salvation Army. She asserts a sexually hostile work environment claim, as well as claims of gender discrimination and retaliation. The case is presently before the court on The Salvation Army's motion for summary judgment. For the reasons set forth below, the motion will be granted in part and denied in part.

### Factual Background

The following facts are either undisputed or presented in the light most favorable to McKinley. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (emphasizing that "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor," when ruling on a motion for summary judgment).

The Salvation Army is a Christian charitable organization structured in a quasi-military fashion. The organization is headed by a General and divided into geographical territories. The Roanoke Corps of The Salvation Army ("Roanoke Corps") is part of the United States Southern Territory. The Roanoke Corps operates an administrative office located at 724 Dale Avenue in

Roanoke; the Red Shield Lodge, a homeless shelter for men located at 821 Salem Avenue; Turning Point, a domestic violence shelter for women located at 815 Salem Avenue; and a Salvation Army thrift store. At all times relevant to the instant action, the operations of the Roanoke Corps were overseen by two Corps Officers, Captains Kenneth and Amy Argot.

In March of 2013, McKinley interviewed for an open case worker position with the Roanoke Corps, which was funded through a grant that The Salvation Army received from the City of Roanoke. The position was created to assist the shelters' residents in obtaining housing. McKinley learned about the position through her friend and former colleague, Evelyn Jordan, who worked as the Director of Turning Point.

McKinley attended two interviews for the case worker position. The second interview was conducted by Jordan, Kenneth Argot, and Michael Moffitt, the Director of the Red Shield Lodge. McKinley claims that Moffitt's sexual harassment of her began during the interview, when he commented on her attractiveness multiple times and told her that she was wearing a beautiful outfit. Moffitt referred to McKinley's good looks as "the elephant in the room," and questioned how she would handle men who may "come on" to her. Jordan Dep. 55-56.

Ultimately, McKinley was offered and accepted the position for which she interviewed. She was employed by The Salvation Army for approximately eight months. Her first day of work was March 25, 2013. In August of 2013, McKinley took a leave of absence to assist her daughter after the birth of a child. She returned in September and worked until November 11, 2013, when she resigned.

After McKinley was hired by The Salvation Army, she initially worked from the administrative office on Dale Avenue. She then moved to the Red Shield Lodge, where she shared an office space with Moffitt and Susan Latta, the case manager at the men's shelter. While

2

based at that location, McKinley generally worked from 7:30 a.m. until 4:00 or 4:30 p.m., depending on when she took a lunch break.

In her position with The Salvation Army, McKinley was assigned homeless clients at both shelters, but most of her time was spent at the Red Shield Lodge. In the beginning, she was primarily responsible for helping her clients find stabilized housing through funds provided by the Community Housing Resource Center ("CHRC"), a local housing organization. At some point thereafter, the relationship between The Salvation Army and the CHRC soured and McKinley's duties changed. She took on more of a case management role in which she assisted Latta with the case load of clients at the men's shelter.

According to McKinley's evidence, Moffitt was her direct supervisor at the Red Shield Lodge and Jordan was her direct supervisor at Turning Point. <u>See</u> McKinley Dep. 80; Jordan Dep. 61-62. Because McKinley spent most of her time working with clients at the Red Shield Lodge, Moffitt was her "primary supervisor." Jordan Dep. 62.

McKinley claims that she was sexually harassed by Moffitt throughout her period of employment with The Salvation Army. While they worked together at the Red Shield Lodge, Moffitt regularly commented on McKinley's attractiveness, her attire, and her perfume choices. For instance, Moffitt would tell McKinley that she was "very attractive," that she "look[ed] great" in what she was wearing, and that he loved her perfume. McKinley Dep. 202, 270 (internal quotation marks omitted); <u>see also</u> <u>id.</u> at 274 ("Some of the comments were, you know, 'Great skirt. Oh, you know, we're not used to seeing any . . . legs around here.'"). Such comments were made on a "daily" basis. McKinley Decl. ¶ 14. Although McKinley "specifically asked Moffitt on dozens of occasions to 'stop' his comments because they made [her] feel uncomfortable,"

3

Moffitt "refused." Id. His conduct "upset McKinley to the point of tears," and she would go to Jordan's office at the women's shelter to "seek support." Jordan Decl. ¶ 10.

McKinley's evidence indicates that the conduct at issue was not limited to remarks regarding her attractiveness and attire. On one occasion, while McKinley and Moffitt were riding in a vehicle, Moffitt allegedly told McKinley that he had been involved in adulterous relationships in the past and propositioned her to begin a similar relationship with him. Moffitt indicated that he had "never started any kind of relationship based upon a friendship, and he proceeded to tell [McKinley] that he would like that to be [her]." McKinley Dep. 277. On another occasion, Moffitt advised McKinley that he had arranged for his wife to assist at the Red Shield Lodge because he was "worried about [his] intentions towards [McKinley]." Id. at 171.

McKinley's evidence also indicates that Moffitt referred to her as a "Jezebel," both directly and in conversations with other employees. For instance, David Winley, one of McKinley's former co-workers, testified that Moffitt told him that McKinley "was a Jezebel and that [Winley] was under her spell." Winley Dep. 71. Winley interpreted Moffitt's comments to mean that McKinley was "a woman with loose morals, a whore practically." Id. at 78. After hearing Moffitt call McKinley a "Jezebel," other employees and clients began to refer to her in the same manner.

On the morning of Monday, November 11, 2013, Moffitt approached McKinley in the parking lot of the Red Shield Lodge. He called McKinley a "Jezebel" and advised her that he was "going to have to fire [her]." McKinley Dep. 157. When McKinley asked Moffitt why he was calling her a "Jezebel," Moffitt "explained [that] a Jezebel creates havoc, and . . . is -- a whore-type person that puts . . . spells on people." Id. at 158 (internal quotation marks omitted).

4

McKinley went to the administrative office and reported Moffitt's comments to Karin Vaughn, the Director of Human Resources for the Roanoke Corps. After speaking with Vaughn, McKinley met with Kenneth and Amy Argot. McKinley advised the Argots that she intended to resign. According to a written statement prepared by McKinley, Kenneth Argot refused to accept her resignation and advised her that she would be placed on paid administrative leave while her complaints were investigated. At the conclusion of her meeting with the Argots, Amy Argot recommended that McKinley "[p]ick [her]self up by the bootstraps, and go on." McKinley Dep. 248.

McKinley was placed on paid administrative leave from Monday, November 11, 2013 to Friday, November 15, 2013. On November 15, 2013, The Salvation Army issued disciplinary notices to Moffitt, Susan Latta, and another employee, Kevin Cashion, for their inappropriate conduct toward McKinley. The notice issued to Moffitt indicated that he had admitted to engaging in conduct that violated The Salvation Army's non-discrimination policies, which included treating Lisa McKinley differently due to her appearance. The notice set forth the following corrective action plan:

> Lisa McKinley is to be reassigned to the Corps under the supervision of the Corps Officer. Mike [Moffitt] is to apologize to Lisa for statements that violate the spirit of the non-discriminatory policies of the Army. Mike is to engage in training after Christmas in regard to proper boundaries and harassment in the workplace. He is to make this training mandatory for all his staff to be completed by 6/1/14. Mike will not discuss staff or client[] issues outside of the workplace or Corps Officer. Mike will not discuss staff issues with other staff.

Def.'s Ex. O.

That same day, Kenneth Argot sent McKinley a letter outlining his findings and The Salvation Army's proposed solution. The letter provided as follows:

> Dear Lisa,

5

> I have investigated your allegations of harassment in the workplace and have found enough evidence to state that there have been comments made that are not in line with The Salvation Army's Social Service Code of Ethics and its Mission Statement. The Salvation Army stands by its policy of non-discrimination and has begun a process of resolving this issue through appropriate disciplinary action.
>
> Since the boundaries on this issue have been blurred by us placing your office at the Red Shield Lodge, we are bringing your office back to the Administrative Offices located at 724 Dale Ave. SE. You will report directly to the Corps Officer as your supervisor. You will be expected to maintain a professional working relationship between the Directors of the Red Shield Lodge and Turning Point. You will have an office next to the Regional Accountant in the upstairs front of the Administrative building. Your office hours will be 8AM to 4:30PM. On Monday morning, Karin will escort you to the Red Shield Lodge to retrieve your computer, files, and other office supplies to bring back to the Corps. Appointments will be scheduled with residents of both the Red Shield Lodge and Turning Point and you will attend both weekly staffing meetings. Limited transportation will be available to you during the Christmas season. However, appointments can be scheduled in your office. You will make every effort to rebuild the relationship between our shelters and the CHRC. In addition, there will be a mandatory training for all staff in regard to Professional Boundaries and Workplace Harassment and Environment after the holidays.
>
> You are a valuable asset to our organization and hope that you find The Salvation Army a great place to work.
>
> Sincerely,
> Captain Ken Argot

Def.'s Ex. S. On Monday, November 18, 2013, after receiving the letter, McKinley resigned.

### Procedural History

McKinley filed the instant action against The Salvation Army on April 10, 2015, in which she asserts three claims under Title VII: (1) gender discrimination in the form of constructive discharge; (2) hostile work environment based on gender; and (3) retaliation in the form of constructive discharge.

Following the close of discovery, The Salvation Army moved for summary judgment on all three claims. The motion has been fully briefed and argued, and is ripe for decision.

6

## Standard of Review

An award of summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To raise a genuine issue of material fact to avoid summary judgment, a party's evidence must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. In deciding whether to grant a summary judgment motion, the court must view the record in the light most favorable to the non-moving party, and draw all reasonable inferences in her favor. Id. at 255; see also Libertarian Party of Va. v. Judd, 718 F.3d 308, 312 (4th Cir. Va. 2013). "The court therefore cannot weigh the evidence or make credibility determinations." Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 568 (4th Cir. 2015).

## Discussion

### I. Gender Discrimination

In Count I of her complaint, McKinley claims that she was subjected to gender discrimination in the form of constructive discharge. Title VII makes it unlawful to discharge an employee because of the employee's sex. 42 U.S.C. § 2000e-2(a). "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." Penn. State Police v. Suders, 542 U.S. 129, 141 (2004). To prevail on a claim of constructive discharge, a plaintiff must establish two elements: the deliberateness of the employer's actions, motivated by unlawful bias; and (2) the objective intolerability of the employment conditions. Freeman v. Dal-Tile Corp., 750 F.3d 413, 425 (4th Cir. 2014).

7

Having reviewed the record in the light most favorable to McKinley, the court concludes that she has failed to meet her burden of establishing a viable claim of constructive discharge. Even assuming that a jury question exists with respect to the intolerability of McKinley's working conditions, her constructive discharge claim nonetheless fails because she has not presented sufficient evidence to create a question of fact as to whether The Salvation Army acted deliberately to induce her to leave. An employer acts deliberately when "the actions complained of were intended by the employer as an effort to force the employee to quit." Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985) (internal citation and quotation marks omitted). This requires "proof of the employer's specific intent to force an employee to leave," either through direct evidence or circumstantial evidence, which may include "a failure to act in the face of known intolerable conditions." Id. "A complete failure to act by the employer is not required; an employer may not insulate itself entirely from liability by taking some token action in response to intolerable conditions." Amirmokri v. Balt. Gas and Elec. Co., 60 F.3d 1126, 1133 (4th Cir. 1995). On the other hand, a response that is "reasonably calculated to end the intolerable working environment" negates any suggestion that the employer deliberately attempted to force an employer's resignation. Id.; see also Landgraf v. USI Film Prods., 968 F.2d 427, 430-31 (5th Cir. 1992) ("A reasonable employee would not have felt compelled to resign immediately following the institution of measures which the district court found to be reasonably calculated to stop the harassment.").

In this case, it is undisputed that The Salvation Army refused to accept McKinley's resignation on November 11, 2013, and insisted that she take paid administrative leave while the organization investigated her complaints of harassment. Moreover, the summary judgment record reflects that, following the investigation, The Salvation Army took prompt remedial actions

8

reasonably calculated to end the harassment. The organization issued disciplinary warnings to Moffitt and two of McKinley's co-workers. The Salvation Army also put forward a plan that would have enabled McKinley to have substantially less interaction with Moffitt and others who worked at the Red Shield Lodge. Kenneth Argot advised McKinley that her workstation would be moved back to the administrative office, where it was originally located, and that she would be directly supervised by the Corps Officer, as opposed to Moffitt.[1]

The mere fact that The Salvation Army expected McKinley to maintain a professional working relationship with the directors of both shelters does not evince an intent to induce her to resign, nor does the fact that Kenneth Argot planned for her to work from 8:00 a.m. to 4:30 p.m., after she moved to the administrative office. Although this work schedule may not have been ideal in light of her family obligations,[2] it was substantially similar to the schedule that she was already working. See McKinley Dep. 65 (explaining that she "would come in around 7:30 and leave around, depending on [her] lunch, 4:00 [or] 4:30"). Moreover, there is no evidence that McKinley requested clarification from Kenneth Argot or asked that her schedule be modified or made more flexible. Instead, she immediately resigned. See, e.g., Tidwell v. Meyer's Bakeries, Inc., 93 F.3d 490, 494 (8th Cir. 1996) ("An employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged."); Aryain v. Wal-Mart Stores Tex. LP, 534 F.3d 473, 481 (5th Cir. 2008) ("In the constructive discharge context, we have recognized that part of an employee's obligation to be reasonable is an obligation

---

[1] In her brief in opposition to the pending motion, McKinley summarily suggests that she should have been transferred to another position within The Salvation Army that would have required no interaction with Moffitt. However, she does not cite to any evidence indicating that such position was available in November of 2013, when she resigned.

[2] According to McKinley's sworn declaration, Moffitt allowed her to work from 7:30 a.m. to 4:00 p.m. to accommodate her daughter's school schedule.

9

not to assume the worst, and not to jump to conclusions too fast.") (internal citation and quotation marks omitted).

Finally, McKinley points to Amy Argot's recommendation that she "[p]ick [her]self up by the bootstraps, and go on." McKinley Dep. 248. While McKinley may have subjectively interpreted this comment to mean that Amy Argot did not take her complaints seriously, no reasonable jury could find from the existing record that the comment was part of a deliberate effort to force McKinley to resign.

In sum, the court concludes that McKinley has not presented sufficient evidence to create a question of fact as to whether The Salvation Army deliberately attempted to induce her to quit. Accordingly, The Salvation Army is entitled to summary judgment on the claim of constructive discharge asserted in Count I.

## II. <u>Hostile Work Environment</u>

In Count II of her complaint, McKinley claims that she was subjected to a sexually hostile work environment. Title VII prohibits an employer from "discriminat[ing] against any individual with respect to [her] . . . terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Since an employee's work environment is a term or condition of employment, Title VII provides a cause of action for hostile work environment. <u>EEOC v. R&R Ventures</u>, 244 F.3d 334, 338 (4th Cir. 2001). To make out such a claim, a female plaintiff must demonstrate that "the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." <u>Ocheltree v. Scollon Prods., Inc.</u>, 335 F.3d 325, 331 (4th Cir. 2003) (en banc). In moving for

10

Case 7:15-cv-00166-GEC-RSB   Document 48   Filed 06/14/16   Page 10 of 18   Pageid#: 1477

summary judgment on this claim, The Salvation Army argues that McKinley is unable to satisfy the third and fourth elements. For the reasons that follow, however, the court is unpersuaded.

To satisfy the third element, McKinley must present sufficient evidence from which a reasonable jury could find that the sex-based harassment was so severe or pervasive as to alter the conditions of her employment and create an abusive or hostile atmosphere. "This element of a hostile work environment claim has both subjective and objective parts." Freeman, 750 F.3d at 421 (internal citation and quotation marks omitted). A plaintiff like McKinley "must show that [she] did perceive, and a reasonable person would perceive, the environment to be abusive or hostile." Freeman, 750 F.3d at 421 (internal citation and quotation marks omitted).

At this stage of the proceedings, The Salvation Army does not challenge the sufficiency of the evidence with respect to the subjective portion of this element, and instead focuses on whether the harassment was objectively severe or pervasive. As the United States Court of Appeals for the Fourth Circuit recently emphasized:

> This objective inquiry is not, and by its nature cannot be, a mathematically precise test. Rather, when determining whether the harassing conduct was objectively severe or pervasive, we must look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. [N]o single factor is dispositive, as [t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.

Id. at 421-22 (internal citations and quotation marks omitted); see also Jennings v. Univ. of N.C., 482 F.3d 686, 696 (4th Cir. 2007) ("Whether gender-oriented harassment amounts to actionable (severe or pervasive) discrimination depends on a constellation of surrounding circumstances, expectations, and relationships. All the circumstances are examined, including the positions and

11

ages of the harasser and victim, [and] whether the harassment was frequent, severe, humiliating, or physically threatening[.]") (internal citation and quotation marks omitted).

Viewing the record in the light most favorable to McKinley, the court concludes that a reasonable jury could find that Moffitt's behavior created an objectively hostile or abusive work environment. See Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 81 (1998) ("[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.") (internal citation and quotation marks omitted). As recounted above, Moffitt, who supervised McKinley and others at the Red Shield Lodge, repeatedly commented on McKinley's looks, her attire, and her perfume. The comments began during McKinley's interview and continued throughout her eight-month term of employment. Although McKinley told Moffitt on multiple occasions that his comments made her feel uncomfortable, the comments continued unabated.

In addition to commenting on McKinley's appearance, Moffitt discussed his previous adulterous relationships with McKinley and suggested that he was interested in engaging in a similar relationship with her. Moffitt also indicated that he had arranged for his wife to assist at the men's shelter because he was worried about his intentions toward McKinley. He ultimately began referring to McKinley as a "Jezebel," both directly and in conversations with others at the Red Shield Lodge, which led to similar references being made by co-workers and clients. David Winley interpreted Moffitt's comments to mean that McKinley was "a woman with loose morals, a whore practically," Winley Dep. at 78, and Moffitt allegedly advised McKinley that he was using

12

the term in that manner.[3]  While Moffitt insists that he only used the term "Jezebel" on one occasion, and that he was merely referring to the drama that McKinley brought to the workplace, "such factual details and credibility determinations are . . . not issues to be resolved at the summary judgment stage."  Walker v. Mod-U-Kraf Homes, LLC, 775 F.3d 202, 209 (4th Cir. 2014).  For present purposes, "it is sufficient that [the plaintiff's] proffered evidence creates a genuine issue of fact as to whether her environment was sufficiently severe or pervasive to alter the conditions of her employment."  Id. (internal citation and quotation marks omitted).

On the present record, the court is convinced that this component of McKinley's hostile work environment claim must be decided by a jury.  While The Salvation Army makes much of the fact that McKinley "alleges no physical contact and none of the comments or conduct alleged by [her] were physically threatening or abusive," Def.'s Br. Supp. Summ. J. 33, the Fourth Circuit has "recognized that harassment need not involve touching or be 'physically threatening' in order to be actionable . . . ."  Walker, 775 F.3d at 209 (internal citation and quotation marks omitted).  Based on Moffitt's consistent and repeated comments, some of which painted McKinley in a sexually demeaning light, the court concludes that a reasonable jury could find that Moffitt's conduct was sufficiently severe or pervasive to alter the conditions of McKinley's employment and create an abusive work environment.  Accordingly, summary judgment on the third element is inappropriate.

With respect to the fourth element of McKinley's hostile work environment claim, McKinley must establish a basis for imposing liability on The Salvation Army.  When a plaintiff's claim is based on the conduct of a co-worker, the employer is liable "only if it was

---

[3] Jezebel was "the Phoenician wife of Ahab who according to the account in I and II Kings pressed the cult of Baal on the Israelite kingdom but was finally killed in accordance with Elijah's prophecy."  Merriam-Webster Dictionary Online, http://www.merriam-webster.com/dictionary/Jezebel (last visited this date) (defining "Jezebel").  The term is also used to describe "an impudent, shameless, or morally unrestrained woman."  Id.

13

negligent in controlling working conditions." Vance v. Ball State Univ., 133 S. Ct. 2434, 2439 (2013). When a plaintiff's claim is based on the conduct of a supervisor, the employer is strictly liable if the harassment culminated in a tangible employment action. Id. "But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventative or corrective opportunities that the employer provided." Id. (citing Faragher v. Boca Raton, 524 U.S. 775 (1998) and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998). This affirmative defense is commonly referred to as the "Faragher-Ellerth defense."

Under the framework outlined above, "it is obviously important whether an alleged harasser is a 'supervisor' or merely a co-worker." Id. at 2443. In Vance, the Supreme Court addressed the split in circuit authority as to who qualifies as a "supervisor" in this context, and held that

> an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, i.e., to effect a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."

Id. (quoting Ellerth, 524 at 761). The Court rejected the more "nebulous" definition adopted by several appellate courts, including the Fourth Circuit, which would provide supervisory status to employees who merely have the ability to exercise discretion over another's daily work. Id.

Based on the evidence presented in this case, the court concludes that a triable question of fact exists as to whether Moffitt was McKinley's supervisor under Vance. While The Salvation Army maintains that Moffitt merely had the power to direct certain tasks that McKinley performed at the Red Shield Lodge, McKinley's evidence, when viewed in her favor, indicates that Moffitt

14

had the authority to take tangible employment actions against her during the relevant time period. Accordingly, the issue of whether Moffitt was McKinley's supervisor cannot be decided on summary judgment.

The Salvation Army also argues that even if Moffitt was McKinley's supervisor, it is entitled to the benefit of the Faragher-Ellerth defense. Under this defense, which is only available if no tangible employment action was taken against the plaintiff, an employer can escape liability if it can establish, by a preponderance of the evidence: (1) that it exercised reasonable care to prevent and correct any harassing behavior; and (2) that the plaintiff unreasonably failed to take advantage of the preventative or corrective opportunities that the employer provided. See Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807. To prevail on this defense, The Salvation Army must demonstrate that there are no material issues of fact and that it is entitled to judgment as a matter of law on both elements. See Smith v. First Union Nat'l Bank, 202 F.3d 234, 144 (4th Cir. 2000) (emphasizing that the employer "must prove both elements of the affirmative defense to avoid vicarious liability").

The Salvation Army argues that both elements of the Faragher-Ellerth defense are met in the instant case. With respect to the first element, The Salvation Army argues that it exercised reasonable care to prevent and correct any sexually harassing behavior, because it had an effective anti-harassment policy and reporting procedure. See Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 268 (4th Cir. 2001) ("Our cases have held that dissemination of 'an effective anti-harassment policy provides compelling proof' that an employer has exercised reasonable care to prevent and correct sexual harassment.") (quoting Lissau v. Southern Food Serv., Inc., 159 F.3d 177, 182 (4th Cir. 1988)). The Salvation Army's anti-harassment policy defined "harassment" and "sexual harassment," and contained the following reporting procedure:

15

> Any employee who believes that he or she is being or has been harassed in violation of this policy should promptly report the incident(s) to his/her immediate supervisor or the Human Resources Department. The employee will, orally or in writing, state the specific details of the harassing behavior. If the report is made orally, a written statement as follow up to the report may be requested. Managers and supervisors who receive a report/reports of harassment are obligated to promptly report this information to the Human Resources Department. The availability of this complaint procedure does not preclude individuals who believe they are being subjected to harassing conduct from promptly advising the offender that his or her behavior is unwelcome and requesting that it be discontinued.

Def.'s Ex. F. The Salvation Army further argues, with respect to the second element of the defense, that McKinley unreasonably failed to take advantage of the available reporting procedure, because "she never took it upon herself to report to human resources or take her complaints up the chain of command" until November 11, 2013, when she complained to Vaughn and the Argots. Def.'s Br. in Supp. of Summ. J. 39.

In response, McKinley emphasizes that the anti-harassment policy does not require employees to immediately report incidents of harassment to the Human Resources Department or the Corps Officers. Instead, it instructs employees to report such incidents to their "immediate supervisor or the Human Resources Department," and expressly permits employees to approach an offender directly and request that the harassing conduct be discontinued. Id. (emphasis added). McKinley argues that she acted in accordance with the policy by advising Moffitt on multiple occasions that his comments made her feel uncomfortable, and by also complaining to Evelyn Jordan about Moffitt's comments. McKinley's efforts to resolve the problem by complaining to these supervisors were unsuccessful, and Moffitt ultimately began to call her a "Jezebel" and suggested that she needed to be terminated. At that point, McKinley went above Moffitt and reported his conduct to the Director of Human Resources and the Argots.

Viewing the record in the light most favorable to McKinley, the court concludes that a genuine issue of material fact exists as to whether McKinley unreasonably failed to take advantage

16

of the reporting procedure described in The Salvation Army's anti-harassment policy. Based on McKinley's evidence and the plain language of the policy, a rational jury could find that she reasonably complained to both of her immediate supervisors about Moffitt's conduct before reporting the offending behavior to Vaughn and the Argots. While, in hindsight, immediately reporting Moffitt's inappropriate comments to upper management might have alleviated the problem and prevented it from escalating, the court is unable to conclude that her failure to do so under the circumstances was unreasonable as a matter of law. See Kramer v. Wasatch County Sheriff's Office, 743 F.3d 726, 754 (10th Cir. 2014) (emphasizing, in the context of the affirmative defense, that "there is a long continuum separating behavior that is less-than-perfect from behavior that is unreasonable as a matter of law"); see also Reed v. MBNA Mktg. Sys., Inc., 333 F.3d 27, 36 (1st Cir. 2003) (holding that an employee's failure to report a supervisor's initial stage of harassment was not unreasonable under the circumstances); Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 105 (2d Cir. 2010) (holding that "an employer is not, as a matter of law, entitled to the Faragher/Ellerth affirmative defense simply because an employer's sexual harassment policy provides that the plaintiff could have complained to other persons as well as the alleged harasser," and that the determination of whether a plaintiff unreasonably failed to take advantage of other avenues instead "depends on the facts and circumstances of a given case"). Accordingly, even assuming that Moffitt's actions did not culminate in a tangible employment action such that the Faragher-Ellerth defense is available in the instant case, The Salvation Army is not entitled to summary judgment on this issue.

For these reasons, The Salvation Army's motion for summary judgment will be denied with respect to the hostile work environment claim asserted in Count II of the complaint.

### III. Retaliation

In the third and final count of her complaint, McKinley asserts a claim for retaliation in violation of Title VII. Specifically, McKinley claims that she was constructively discharged in retaliation for complaining about discriminatory and harassing conduct. For the reasons set forth above, the court concludes that McKinley's evidence is insufficient to support a claim of constructive discharge. Accordingly, The Salvation Army's motion will be granted with respect to Count III.

### Conclusion

For the reasons stated, The Salvation Army's motion for summary judgment will be granted in part and denied in part, and the case will proceed to trial on McKinley's hostile work environment claim.

The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

DATED: This 14th day of June, 2016.

_____
Chief United States District Judge